UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

A.B., an Individual,

Plaintiff,

v.

EXTENDED STAY AMERICA, INC.;
ESA P PORTFOLIO OPERATING
LESSEE L.L.C. d/b/a EXTENDED STAY
AMERICA - PORTLAND –
VANCOUVER,

Defendants.

Case No. 3:22-cv-5939

**FIRST AMENDED COMPLAINT**
**Trafficking Victims Protection**
**Reauthorization Act (18 U.S.C. §**
**1595)**

**DEMAND FOR JURY TRIAL**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff A.B., by and through the undersigned counsel, hereby respectfully submits her first amended complaint for damages and makes the following averments.

## INTRODUCTION

1. For years, criminal sex traffickers have brazenly operated in and out of hotels throughout this country. Criminals parade their misconduct openly on hotel properties throughout the United States while hotels and the hospitality industry continue to neglect the criminal misconduct by turning a blind eye to criminal misconduct and collecting profits and other benefits from the misconduct at the expense of human life, human rights, and human

First Amended Complaint for Damages - 1

dignity.

2. Defendants knew and have known for more than a decade that sex trafficking repeatedly occurs on their properties and under their brand flag.

3. Rather than taking timely and effective measures to thwart this epidemic, Defendants have instead chosen to ignore and thereby facilitate commercial sex trafficking on their properties and in the hotels they operate, supervise, and/or brand, enjoying the monetary profit and other benefits stemming from rooms rented for the purpose of sex trafficking, while making no attempt to train employees, raise awareness, report the activities, or put an end to the repeated abuses of victims at their properties.

4. This action for damages is brought by the Plaintiff, a survivor of sex trafficking, hereinafter identified by her initials, A.B., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

5. A.B. was trafficked for commercial sex in Oregon and Washington. In order to keep a roof over her head, A.B. was sold via commercial sex transactions at the Defendants' hotel properties where force, fraud, and coercion were used against her, while Defendants turned a blind eye and continued to benefit.

6. Plaintiff first met her trafficker in what she believed to be the beginning of a romantic relationship. Unfortunately, her trafficker had an ulterior motive. Her trafficker used common methods of coercion, including manipulation, humiliation, degradation, exhaustion, isolation, choking, incurrence of debt, and other methods to force compliance.

7. A.B. was advertised on www.Backpage.com, a website notoriously known for sex trafficking and commercial sexual exploitation. Defendants provided open access to the website, permitting traffickers and buyers to harbor A.B. for the purpose of sex trafficking.

8. Backpage.com was repeatedly used by the trafficker to control and arrange for A.B.

First Amended Complaint for Damages - 2

Restore the Child, PLLC
2522 N Proctor St, Ste 85
Tacoma, Washington 98406
Phone: (253) 392-4409

to be sold repeatedly to buyers who frequented the Defendants' hotel properties to purchase victims of sex trafficking, including A.B.

9. With knowledge of the problem, and as a direct and proximate result of the Defendants' multiple failures to mandate, implement, establish, execute, and/or modify anti-trafficking efforts on their hotel properties, A.B. was sex trafficked, sexually exploited, and victimized repeatedly at Defendants' hotels.

10. The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, against the Defendants who, motivated by profits and the value of the "good will" of their brand, refused to institute meaningful steps to stop trafficking, and instead continued to operate their hotels in a manner which enabled, harbored, held, facilitated, or any combination of the foregoing, the repeated and continuous trafficking, exploitation, and victimization of A.B. for their own benefit.

11. The Plaintiff brings this action for damages against the Defendants listed herein for knowingly benefiting from facilitating a business venture they knew, or should have known, to be engaging in sex trafficking in violation of the TVPRA. Defendants turned a blind eye to years of direct knowledge regarding anti-trafficking efforts and failed in their mandated and assumed duties to protect Plaintiff and others from sex trafficking.

12. Defendants grossly failed and continue to fail to implement and effectuate policies and standards sufficient to combat sex trafficking throughout their hotel operations.

## PARTIES

13. Plaintiff A.B. is a natural person who currently resides in Riverside, California.

    a. Plaintiff A.B. was a young adult when she first met the man who would become her trafficker online. Using common methods of force, fraud, and coercion, such as the ruse of a romantic relationship, the trafficker forced A.B. into

First Amended Complaint for Damages - 3

commercial sex, selling her throughout Washington and Oregon. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. § 7102 (17) and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C § 7102 (16).

b. Due to the sensitive nature of the allegations, Plaintiff A.B. requests that this Court grant a protective order pursuant to Federal Rule of Civil Procedure 26(c) to permit her to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit thereafter.[1]

c. Generally, under the Federal Rules of Civil Procedure, pleadings must state the names of all parties.[2] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[3] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[4]

d. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape and commercial sex trafficking. Plaintiff fears stigma from her family, friends, employer, and community if her true identity

---

[1] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[2] Fed. R. Civ. P. 10(a).

[3] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir. 1981); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[4] Fed. R. Civ. P. 26(c).

First Amended Complaint for Damages - 4

Restore the Child, PLLC
2522 N Proctor St, Ste 85
Tacoma, Washington 98406
Phone: (253) 392-4409

is revealed in the public record.

e.  In order to maintain her privacy and safety, Plaintiff should not be compelled to disclose her identity. Plaintiff's privacy and safety interests substantially outweigh the customary practice of judicial openness.[5]

f.  Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her personal life or future employment prospects.

14.  Defendant Extended Stay America, Inc. ("ESA") is one of the largest hotel brands in the world. It owns and operates the Extended Stay America® brand with 652 hotels in forty-four (44) states throughout America. It is a Delaware corporation and can be served by its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. ESA is registered to do business in Washington. At the time of the incidents alleged herein, directly and through its agents, affiliates, and franchisee (Defendant ESA P Portfolio Operating Lessee L.L.C. d/b/a Extended Stay America – Portland – Vancouver) offered public lodging services at the Extended Stay America hotel located at 11506 NE 3rd Street (formerly 300 NE 115th Avenue prior to December 20, 2010), Vancouver, Washington 98684.

a.  The Extended Stay America – Portland – Vancouver ("Extended Stay hotel") is an Extended Stay America branded hotel.

---

[5] *Supra* n. 1 at 1068 (the court joined its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

First Amended Complaint for Damages - 5

b. As a hotel operator and brand, ESA controls the training, procedures, and policies, and decisions on implementation and execution of policy for its branded properties, including the Extended Stay America – Portland – Vancouver, where A.B. was trafficked, a hotel operated through its subsidiary or franchisee, ESA P Portfolio Operating Lessee L.L.C. ("ESA Portfolio").

c. As a hotel operator and brand, Defendant ESA controls human trafficking training, procedures, and policies, and decisions on implementation and execution of policy for its branded properties, including the Extended Stay hotel where A.B. was trafficked.

d. ESA conducts its business under its legal name and offers franchises in the United States under the brand Extended Stay America®.

e. ESA, through its wholly owned subsidiary and/or franchisee ESA Portfolio, controls the training, procedures, and policy for the Extended Stay America – Portland – Vancouver where A.B. was trafficked, which bears its brand name. Through its subsidiary relationship and/or franchise agreement with ESA Portfolio, ESA knowingly benefited and/or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking through the room rentals in which A.B. was trafficked.

f. ESA requires the hotels in its portfolio—including the Extended Stay America – Portland – Vancouver—to comply with ESA brand standards and all local, state, and federal laws.

g. ESA participated in a hotel operating venture that included ESA and several of ESA's subsidiaries. The venture also included hotel staff and employees at the Extended Stay hotel, including but not limited to, the maintenance workers,

First Amended Complaint for Damages - 6

housekeeping and janitorial staff, front desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bellhops, and valets. Together, the aforementioned venture participants own, supervise, and/or manage the Extended Stay hotel where A.B. was trafficked.

h. Defendant ESA owns, supervises, and/or operates the Extended Stay hotel located at 11506 NE 3rd Street (formerly 300 NE 115th Avenue prior to December 20, 2010), Vancouver, Washington 98684. Because ESA owned and operated the Extended Stay America – Portland – Vancouver where A.B. was trafficked and was responsible for its management, supervision and day-to-day operations, ESA knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking through the room rentals A.B. was victimized in.

i. Defendant ESA receives revenue from the money generated by the operations at all Extended Stay America hotels, including revenue from the rate charged for the room in which Plaintiff was trafficked at the Extended Stay America – Portland – Vancouver.

j. Defendant ESA conducts and operates businesses throughout the State of Washington.

k. Defendant ESA is subject to the jurisdiction of this Court because it regularly transacts business in the State of Washington; entered and remains in franchise agreements with Washington entities and/or entities operating hotels in Washington, including its franchise agreement with Defendant ESA P Portfolio Operating Lessee L.L.C. d/b/a Extended Stay America – Portland – Vancouver where A.B. was trafficked; derives substantial revenue from services rendered

First Amended Complaint for Damages - 7

in Washington, including through the operation of numerous Extended Stay America branded hotels in Washington; has caused indivisible injuries to A.B. in Washington; and profited from illegal commercial sex trafficking involving Plaintiff at its hotel.

l.  ESA is the principal in an agency relationship with the Extended Stay hotel. In addition to ESA's direct liability under Section 1595 of the TVPRA, ESA is vicariously liable for the acts and/or omissions of the staff at its Extended Stay hotel and all of its franchisee hotels.

m.  The Extended Stay hotel where A.B. was trafficked has apparent agency for ESA so as to establish vicarious liability under Washington law, in addition to an actual agency relationship.

n.  ESA has ratified the actions and inactions of the Extended Stay hotel.

o.  ESA exercises day-to-day control over the Extended Stay hotel through its brand standards and retains control over the Extended Stay property under the terms of its operation and/or franchise agreements.

p.  Defendant ESA and Extended Stay hotel is a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Extended Stay hotel where the Plaintiff was trafficked for commercial sex acts. Defendant ESA and Extended Stay hotel each share the common policies and practices complained of herein.

q.  Defendant ESA and Extended Stay hotel jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

r.  As an integrated enterprise and/or joint employer, Defendant ESA and Extended Stay hotel are separately and jointly responsible for compliance with all

First Amended Complaint for Damages - 8

applicable laws.

s.  As an integrated enterprise and or joint employer, Defendant ESA and Extended Stay hotel are jointly and severally liable for any damages caused by employees.

t.  As a principal and hotel operator, Defendant ESA controls the training policies, and decisions on implementation and execution of policy for its branded properties, including the Extended Stay hotel where A.B. was trafficked.

u.  Defendant ESA maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with ESA brand standards and all local, state, and federal laws.

v.  Upon information and belief, Defendant ESA controls and requires a uniform reservation and marketing system; credit processing system; training and policy on brand standards, including any standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by ESA; Wi-Fi qualifications and/or Wi-Fi providers; language and policy used on internet landing pages; thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections; systems used to monitor customer reviews and responses; and other systems related to the daily operations at the Extended Stay hotel where Plaintiff was trafficked.

w.  Through ESA's relationship with the staff at the Extended Stay hotel where Plaintiff was trafficked and where traffickers of Plaintiff were guests or visitors, ESA knowingly benefited, or received something of value, from its participation in a venture which it knew or should have known to engage in sex trafficking through, *inter alia*, royalty payments, licensing fees, and percentages of the gross

First Amended Complaint for Damages - 9

room revenue which ESA is entitled to under operation and/or franchise agreements.

x. ESA benefits financially from room rentals and other incidentals recognized through renting rooms at the brand property in which the Plaintiff was commercially sex trafficked.

y. ESA has benefited by turning a blind eye to rampant commercial sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their branded hotels.

z. ESA hewed to a common policy of actively ignoring signs of ongoing human trafficking on its properties, including the Extended Stay hotel where Plaintiff was trafficked.

aa. ESA knew or should have known that the Extended Stay hotel where Plaintiff A.B. was trafficked was an area known to local sheriffs for high incidences of crime and prone to sex trafficking activity, including forced prostitution, on and around the hotel premises, including when Plaintiff A.B. was trafficked.

15. Defendant ESA P Portfolio Operating Lessee L.L.C. ("ESA Portfolio"), doing business as the Extended Stay America – Portland – Vancouver ("Extended Stay hotel"), owns and operates the Extended Stay hotel located at 11506 NE 3rd Street (formerly 300 NE 115th Avenue prior to December 20, 2010), Vancouver, Washington 98684 where the Plaintiff was trafficked for sex. Defendant ESA Portfolio knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking. Defendant ESA Portfolio is a Delaware limited liability company and can be served by its registered agent, National Registered Agents, Inc., at 711 Capitol Way S, Suite 204, Olympia, Washington 98501. Defendant ESA Portfolio is a subsidiary or franchisee

First Amended Complaint for Damages - 10

of Defendant ESA. Directly and through its subsidiary and/or franchise agreement with Defendant ESA, Defendant ESA Portfolio directly offered public lodging services at the Extended Stay hotel located at 11506 NE 3rd Street (formerly 300 NE 115th Avenue prior to December 20, 2010), Vancouver, Washington 98684 where the Plaintiff was trafficked for sex.

    a. Defendant ESA Portfolio is a subsidiary and/or franchisee of ESA and does business as the Extended Stay America – Portland – Vancouver.

    b. The Extended Stay America – Portland – Vancouver is an ESA brand hotel.

    c. Franchised Extended Stay America hotels are identified by ESA's trademark and by certain other trade names, service marks, trademarks, logos, emblems and indicia of origin (known as "proprietary marks").

    d. As an ESA franchisee, Defendant ESA Portfolio received confidential operating and brand standard manuals that contained both mandatory and recommended standards and procedures Defendant ESA Portfolio was required to use when operating the Extended Stay America – Portland – Vancouver.

    e. The franchise agreement Defendant ESA Portfolio entered into with ESA granted Defendant ESA Portfolio the right to use Extended Stay America trademarks for the operations of the Extended Stay America – Portland – Vancouver where Plaintiff was trafficked.

    f. Through its subsidiary or franchisee relationship with Defendant ESA, Defendant ESA Portfolio is required to implement the training, procedures, and policies as instructed by Defendant ESA. Defendant ESA Portfolio is also required to provide ESA with a percentage of gross room revenue and money generated from the operation of the Extended Stay America – Portland – Vancouver, including the rates charged for the rooms within which Plaintiff was

First Amended Complaint for Damages - 11

trafficked; required to use the wireless internet access provided by ESA; and was required to comply with the standards and policies in ESA's operating manual.

g. Defendant ESA Portfolio was responsible for the day-to-day operations, under ESA's supervision, at the Extended Stay America – Portland – Vancouver where Plaintiff was trafficked, and was required, by ESA, to undergo on-site and other operation training; to provide ESA with a percentage of the gross room revenue from the money generated by the operations of Extended Stay America – Portland – Vancouver; to provide ESA with a percentage of the rate charged for the rooms in which A.B. was trafficked; to provide ESA with program fees from a percentage taken from gross room revenues generated by the operations of Extended Stay America – Portland – Vancouver, including a percentage of the rate charged for the rooms in which A.B. was trafficked; to attend ESA's annual conference; to use the wireless internet access provided by ESA; and to comply with the standards and policies in ESA's operating manual.

h. As an operator of the Extended Stay America – Portland – Vancouver, operating under the supervision of ESA, where Plaintiff was trafficked, Defendant ESA Portfolio knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking through the room rentals A.B. was victimized in at the Extended Stay America – Portland – Vancouver.

i. Defendant ESA Portfolio is subject to the jurisdiction of this Court because it is registered to do business in Washington, regularly does business in Washington, entered into a franchise agreement with ESA in Washington, caused indivisible injuries to Plaintiff in Washington, contracts to supply services in Washington,

First Amended Complaint for Damages - 12

and knowingly profited from an illegal sex trafficking venture at the Extended Stay America – Portland – Vancouver located at 11506 NE 3rd Street (formerly 300 NE 115th Avenue prior to December 20, 2010), Vancouver, Washington 98684.

21. Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

**JURISDICTION AND VENUE**

22. This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States.

23. Venue is proper in this District Court as this District Court is a judicial district where Defendants are subject to personal jurisdiction in accordance with 28 U.S.C. § 1391(b)(3).

24. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

25. Defendants have submitted to the jurisdiction of Washington and have purposefully availed themselves of the privilege of conducting acts in Washington through their dominion and control over their respective brands with brand subsidiaries, brand property subsidiaries, and operating hotels, and day-to-day operation of the hotels, and thus, invoking the benefits and protections of the laws in Washington; Washington has an equally strong interest in protecting and assuring the safety of persons within its State.

First Amended Complaint for Damages - 13

Restore the Child, PLLC
2522 N Proctor St, Ste 85
Tacoma, Washington 98406
Phone: (253) 392-4409

## SEX TRAFFICKING UNDER FEDERAL LAW

26. The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

27. Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

28. To best understand the mechanism by which sex trafficking is prohibited by federal criminal law, it's best to address these elements in the reverse. Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and § 1590. The crime of slavery can then be divided into the two (2) elements remaining: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. § 1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. § 1589.

29. Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, it is nevertheless a long- recognized and familiar atrocity.

## FACTUAL ALLEGATIONS

**A. THE HOSPITALITY INDUSTRY'S PARTICIPATION IN AND FACILITATION OF THE SEX TRAFFICKING INDUSTRY**

30. Human trafficking is the world's fastest growing crime.[6] While the term 'human

---

[6] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

First Amended Complaint for Damages - 14

Restore the Child, PLLC
2522 N Proctor St, Ste 85
Tacoma, Washington 98406
Phone: (253) 392-4409

trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of all illegal drugs.[7]

31. The hospitality industry plays a crucial role in the sex trade.[8] The trope of the "no-tell motel" is certainly not a new one. Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

32. The hotel industry derives revenue from hotel room doors ("keys") through relationships with production placement. This has incentivized hotels to open doors indiscriminately without regard to the high incidences of trafficking, which have been known and documented by law enforcement and non-government organizations.

33. According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[9] Traffickers and buyers alike frequently use hotel rooms to exploit victims.

34. Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. This is referred to as an "in call."

35. Hotels are also the venue of choice for buyers seeking an "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e., those

---

[7] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.
[8] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[9] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

First Amended Complaint for Damages - 15

Restore the Child, PLLC
2522 N Proctor St, Ste 85
Tacoma, Washington 98406
Phone: (253) 392-4409

purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[10]

36. The problem is industry wide. In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[11]

37. According to the Polaris Project, "75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation… Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."[12]

38. Due to the failure of the hospitality industry to address the issue, hotels are *the* venue of choice for sex trafficking.[13] Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce company-wide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

39. Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has a duty to train and equip staff on how to identify, report, and prevent sexual exploitation where it is most likely to occur.[14]

40. But aside from their unique position in this epidemic, hotels and motels have the

---

[10] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[11] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

[12] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).

[13] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

[14] *Combating Human Trafficking in the Hotel Industry*, HUFFPOST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754 (last visited November 18, 2019).

First Amended Complaint for Damages - 16

Restore the Child, PLLC
2522 N Proctor St, Ste 85
Tacoma, Washington 98406
Phone: (253) 392-4409

highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[15]

41.    Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[16]

42.    From check-in to check-out, there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. Proper training and the implementation of reasonable security and cybersecurity measures are the bare minimum necessary for hospitality companies to address regular sex trafficking occurring under their flag.

43.    There are many signs of sex trafficking, some of which may be obvious, or under a properly trained staff, would require action. These signs include: paying with cash; an excess of condoms in rooms; individuals carrying or flashing large amounts of cash; excessive amounts of cash stored in the room; renting two (2) rooms next door to each other; declining in-room service for several consecutive days; continuously requesting additional towels and sheets at varying times; significant foot traffic in and out of room(s); men traveling with multiple women who

---

[15] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[16] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

First Amended Complaint for Damages - 17

appear unrelated, or men who rent rooms for someone else; women known to be staying in rooms without leaving; women displaying physical injuries or signs of fear and anxiety; guests checking in with little or no luggage; hotel guests who prevent another individual from speaking for themselves; or a guest controlling another's identification documents.[17]

44.     Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[18] Thus, hospitality companies have acknowledged their obligation to adopt policies and procedures related to sex trafficking, but have failed or even refused to enforce these policies and procedures as brand standard through to the property level.

45.     Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[19]

46.     The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

47.     At the General Assembly of the United Nations ("UN") convened in New York, New York in November 2000, the Palermo Protocol to prevent, suppress, and punish trafficking in persons was adopted.[20]

48.     In this regard, End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[21]

---

[17] *Id.* See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[18] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[19] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp- content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[20] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime, *adopted* Nov. 15, 2000, 2237 U.N.T.S. 319.
[21] ECPAT-USA, *No Vacancy For Child Sex Traffickers Impact Report* (2017), *available at*:

First Amended Complaint for Damages - 18

Restore the Child, PLLC
2522 N Proctor St, Ste 85
Tacoma, Washington 98406
Phone: (253) 392-4409

49. The Code identifies the following six (6) steps companies can take to prevent child sex trafficking: (1) establish corporate policy and procedures against sexual exploitation of children; (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases; (3) include a clause in future partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children; (4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.

50. ECPAT-USA also identifies hotel-specific best practices for preventing sex trafficking, including but not limited to:[22]

    a. Develop a formal policy against trafficking;

    b. Develop a protocol for response;

    c. Conduct periodic training on indicators;

    d. Not renting by the hour;

    e. Not permitting cash payments;

    f. Blocking "internet access to popular websites for online sex ads";

    g. Monitoring "online sex ads such as Craigslist and Backpage for your hotel name and pictures of your rooms and guests";

    h. Change Wi-Fi passwords in rooms and cafes regularly;

    i. Require that all visitors are logged, including guest name, visitor name,

https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/59c9b6bfb07869cc5d792b8c/1506391761747/NoVacany_Report.pdf.
[22] ECPAT-USA, ECPAT-USA Anti-Trafficking Hotel Checklist, available at https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf.

First Amended Complaint for Damages - 19

Restore the Child, PLLC
2522 N Proctor St, Ste 85
Tacoma, Washington 98406
Phone: (253) 392-4409

arrival time, departure time, and room number;

j. Actively greet and speak with all visitors arriving at night;

k. Watch for a trend of visitors to the same room; and

l. Be aware of rooms with excess condoms, lubricants, and towels and report these indicators to management.

51. Starting in 2010, www.Backpage.com became the leader in the advertisement of "adult services," generating annual revenue of approximately $150,000,000.00 and approximately $3,100,000.00 from sex advertisements in just one week.[23] Between January 2013 and March 2015, ninety-nine percent (99%) of global income related to or arising from www.Backpage.com was derived from the website's "adult section," including advertisements sexually exploiting children. Backpage has been called the "World's Top Online Brothel."[24]

52. The United States Senate Permanent Subcommittee on Investigations issued a staff report in January 2017 (hereinafter "Senate Report") entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking" that summarizes the role www.Backpage.com has played in the burgeoning criminal industry of sex trafficking, in which www.Backpage.com does not deny that the website is used for criminal activity, including the sex trafficking of children.[25]

53. According to the January 2017 Senate Report, Backpage is involved in 73% of all child trafficking reports that the National Center for Missing and Exploited Children (NCMEC) receives from the general public (excluding reports by Backpage itself).[26]

---

[23] *See e.g.* http://www.chicagotribune.com/business/ct-backpage-raided-ceo-carl-ferrer-arrested-20161006-story.html; https://www.nytimes.com/2016/10/07/us/carl-ferrer-backpage-ceo-is-arrested.html?_r=0; and https://www.washingtonpost.com/news/morning-mix/wp/2016/10/07/ceo-of-backpage-called-worlds-top-online-brothel-arrested-on-pimping-charges/?utm_term=.bbcf8b9dcb10.
[24] *Id.*
[25] *See* http://www.portman.senate.gov/public/index.cfm/files/serve?File_id=5D0C71AE-A090-4F30-A5F5-7CFFC08AFD 48. Additionally, a copy of the full Senate Report plus its appendix can be accessed online at: https://www.hsgac.senate.gov/subcommittees/investigations/reports.
[26] *Id.*

First Amended Complaint for Damages - 20

Restore the Child, PLLC
2522 N Proctor St, Ste 85
Tacoma, Washington 98406
Phone: (253) 392-4409

54. One of the principle findings of the Senate Report is that Backpage knows that it facilitates prostitution and child sex trafficking: "Backpage moderators told the Subcommittee that everyone at the company knew the adult-section ads were for prostitution and that their job was to "put[] lipstick on a pig" by sanitizing them…[and] the company has often refused to act swiftly in response to complaints about particular underage users—preferring in some cases to interpret these complaints as the tactics of a competing escort."[27]

55. In April 2018, Carl Ferrer, the chief executive of Backpage.com, plead Backpage guilty to human trafficking of a teenaged girl, and money laundering by concealing the proceeds from facilitating criminal activity.[28]

56. In 2010, the United States government released its Trafficking in Persons Report, which included an assessment of trafficking in the United States. The Trafficking in Persons Report 2010 stated that approximately 12.3 million adults and children were in forced labor, bonded labor, and force prostitution around the world, but that only 4,166 trafficking prosecutions were successful in 2009.[29]

57. During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity. It ought to concern every community, because it tears at our social fabric. It ought to concern every business, because it distorts markets. It ought to concern every nation, because it endangers public health and fuels violence and organized crime."[30]

---

[27] *See id.*

[28] *See* Jackman, *Backpage CEO Carl Ferrer pleads guilty in three states, agrees to testify against other website officials*, The Washington Post (April 13, 2018) *available at* https://www.washingtonpost.com/news/true-crime/wp/2018/04/13/backpage-ceo-carl-ferrer-pleads-guilty-in-three-states-agrees-to-testify-against-other-website-officials/.

[29] CNN Wire Staff, *U.S. human trafficking report includes U.S. cases for first time*, CNN.com (Jun. 14, 2010), available at https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.

[30] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.

First Amended Complaint for Damages - 21

Restore the Child, PLLC
2522 N Proctor St, Ste 85
Tacoma, Washington 98406
Phone: (253) 392-4409

58. Statistics released in 2014 by the International Labor Organization ("ILO") showed that approximately 4.5 million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of $99 billion dollars for sex traffickers worldwide.[31] Put another way, the numbers showed that a sex trafficker's annual profit per victim was approximately $22,000.00.[32]

59. A scholarly article published in 2015 estimated that pimps could earn $25,000.00 to $33,000.00 per week selling in the Atlanta, Georgia area.[33] This volume of and profit from sex trafficking also aligned with internet advertising for the sex trafficking industry occurring in roughly the same time period. For example, in 2015, one advertisement in the Atlanta section of the www.Backpage.com website triggered 181 clients, and calls or texts from twenty-seven (27) men expressing interest – in a span of just ninety (90) minutes.[34]

60. In December 2015, President Obama appointed eleven (11) survivors of human trafficking to the inaugural United States Advisory Council on Human Trafficking to advise and make recommendations on federal anti-trafficking policies to the President's Interagency Task Force to Monitor and Combat Trafficking in Persons.[35]

61. The United States Department of Justice ("DOJ") brought 248 sex trafficking prosecutions in Fiscal Year 2015 and secured convictions against 291 sex traffickers.[36] In the previous year, DOJ convicted a total of 184 human traffickers (inclusive of labor trafficking) and in the subsequent year, DOJ convicted a total of 439 human traffickers (inclusive of labor

[31] International Labour Office, *Profits and Poverty: The Economics of Forced Labour* (2014), at 13, *available at* https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.
[32] *Id.* at 15.
[33] Sarkisian, *supra* n.12 at 4.
[34] *Id.* at 5.
[35] U.S. Dep't of State, *2016 Trafficking in Persons Report* (2016), at 41, *available at* https://www.state.gov/documents/organization/258876.pdf.
[36] *Id.* at 389.

First Amended Complaint for Damages - 22

trafficking).[37]

62. Despite these efforts of governmental and non-governmental organizations to combat human trafficking, the hospitality industry as a whole, continued to lag behind in its efforts to prevent human trafficking. A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation report that the sexual exploitation took place in a hotel.[38]

63. Even estimates by attorneys *for the* hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[39] In fact, some scholars estimate that hotels and motels account for over ninety percent (90%) of commercial exploitation of children.[40] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.[41]

64. Between 2007 and March 2015, more than 1,400 human trafficking cases have been reported to the National Trafficking Resource Center.[42] The hotel industry is enabling instead of preventing the sexual exploitation of children.[43]

65. The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex traffickers move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from

[37] Human Rights First, *Fact Sheet 2017* (2017), *available at* http://www.humanrightsfirst.org/sites/default/files/TraffickingbytheNumbers.pdf.
[38] Sarkisian, *supra* n.12.
[39] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).
[40] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).
[41] U.S. Dep't of State, *supra* n.36, at 387.
[42] Polaris, *Human Trafficking and the Hotel Industry* (2015), *available at* https://polarisproject.org/resources/human-trafficking-and-hotel-industry.
[43] *See* http://www.ecpatusa.org/wp-content/uploads/2016/05/Regional-Report-North-America.pdf.

First Amended Complaint for Damages - 23

any possible means of escape or rescue. Indeed, hotel staff are often the only outside witnesses to the victim's abuse. But traffickers are well aware of the seclusion and anonymity attendant with booking rooms with hotel chains – they know it is unlikely that they will be disturbed.

66. Due to the hospitality industry's refusal to adopt and mandate company-wide anti-trafficking policies and practices, children and other vulnerable persons are trafficked for sex in hotels throughout the United States.

67. Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[44] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[45]

68. Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or to execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

B.    **DEFENDANTS' KNOWLEDGE OF THE ROLE OF THEIR BRANDS, FRANCHISES, AND HOTELS IN THE SEX TRAFFICKING INDUSTRY**

69. Defendants have been on notice of repeated incidences of sex trafficking occurring on their hotel properties through publicly available information regarding sex trafficking in hotels. Upon information and belief, publicly available information was received and reviewed

---

[44] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[45] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

First Amended Complaint for Damages - 24

by Defendants at least between 2012 and 2013.

70. Upon information and belief, Defendant ESA Portfolio was apprised of instances of sex trafficking via its corporate parent or franchisor, Defendant ESA. In addition, ESA Portfolio has personal knowledge of the trafficking of Plaintiff A.B. at the Extended Stay hotel. As outlined in further detail below, Extended Stay hotel employees openly observed signs of trafficking, did not aid Plaintiff, and thereby had constructive and/or actual knowledge of the trafficking of A.B. at the Extended Stay hotel. Despite these open and obvious signs, Defendant ESA Portfolio profited and received revenue, a percentage of which it then provided to Defendant ESA, directly from Plaintiff's trafficking via the rooms rented by her trafficker.

71. Defendant ESA has been on notice of repeated incidences of sex trafficking occurring at their Extended Stay hotel yet the brand manager failed to take the necessary action to prevent sex trafficking and still persists in failing to take the necessary action to prevent sex trafficking at its hotel.

72. Upon information and belief, Defendant ESA regularly reviews and monitors customer reviews of its properties posted on various online review websites such as yelp.com, Travelocity, and TripAdvisor, including the Extended Stay hotel where Plaintiff was trafficked.

73. For years, Defendant ESA had actual knowledge of sex trafficking occurring on its branded hotel properties because ESA and Extended Stay hotel knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. ESA and Extended Stay hotel allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Extended Stay hotel. ESA and Extended Stay hotel facilitated the trafficking through its practices, policies, and procedures. ESA and Extended Stay hotel failed to take appropriate action to prevent the

First Amended Complaint for Damages - 25

trafficking of individuals for sex so that ESA and Extended Stay hotel could continue to profit from the business that trafficking brings, including business from out-of-state.

74. Defendant ESA had constructive knowledge of sex trafficking occurring on its branded hotel properties because ESA and Extended Stay hotel knew or should have known that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. ESA and Extended Stay hotel allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Extended Stay hotel. ESA and Extended Stay hotel facilitated the trafficking through its practices, policies, and procedures. ESA and Extended Stay hotel failed to take appropriate action to prevent the trafficking of individuals for sex so that ESA and Extended Stay hotel could continue to profit from the business that trafficking brings, including business from out-of-state.

75. ESA knew or should have known that the Extended Stay hotel where Plaintiff A.B. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.B. was trafficked.

76. At the time of the incidents alleged herein, Defendant ESA was in an agency relationship with Extended Stay hotel and offered public lodging services in the hotels.

77. Defendant ESA exercised ongoing and systemic control over operations sufficient to establish an agency relationship with Extended Stay hotel.

78. Defendant ESA was in an agency relationship with the Extended Stay hotel offering public lodging services in the hotel. This agency relationship was created through Defendant ESA's exercise of an ongoing and systemic right of control over Extended Stay hotel by Defendant ESA's operations, including the means and methods of how Extended Stay America

First Amended Complaint for Damages - 26

branded hotels conducted daily business through one or more of the following actions:

    a. providing the software, hardware, and platforms where suspicious activity or other concerns should be addressed with the Brand;

    b. providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

    c. providing new hire orientation on human rights and corporate responsibility;

    d. providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

    e. providing and controlling customer review and response platforms;

    f. hosting online bookings on Defendant ESA's domain;

    g. requiring Extended Stay America branded hotels to use Defendant ESA's customer rewards program;

    h. requiring Extended Stay America branded hotels to use Defendant ESA's property management software;

    i. requiring Extended Stay America branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

    j. providing IT support for all property management systems, owned, operated and required by ESA;

    k. setting employee wages;

    l. making employment decisions;

    m. advertising for employment;

    n. sharing profits;

    o. providing standardized training methods for employees;

    p. building and maintaining the facility in a manner specified by the owner;

First Amended Complaint for Damages - 27

Restore the Child, PLLC
2522 N Proctor St, Ste 85
Tacoma, Washington 98406
Phone: (253) 392-4409

q. providing the ability of Defendant ESA to cancel any agreement with Extended Stay America branded hotels if rules are violated;

r. conducting regular inspection of the Extended Stay America branded hotels and operations or management by Defendant ESA;

s. providing standardized or strict rules of operation;

t. conducting regular inspection of the facility and operation by owner;

u. fixing prices; or

v. engaging in other actions that deprive Extended Stay America branded hotels of independence in business operations.

79. An apparent agency also exists between Defendant ESA and Extended Stay America branded hotels. Defendant ESA held out Extended Stay America branded hotels to the public as possessing authority to act on its behalf.

80. Extended Stay hotel's website is hosted at www.extendedstayamerica.com.

81. When staying at Extended Stay America branded hotels, guests receive Extended Perks for bookings.

82. The Extended Stay hotel is an alter ego, representative, agent, or co-conspirator of Defendant ESA. Defendant ESA exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Extended Stay hotel where Plaintiff A.B. was trafficked for sex.

83. For years, Defendant ESA has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Extended Stay America branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff A.B. at the Extended Stay hotel that forms the basis of this complaint.

First Amended Complaint for Damages - 28

a. In August 2010, there was a rise in prostitution arrests at an Extended Stay America branded hotel located in Burbank, California as a result of concentrated enforcement operations at local hotels that targeted narcotics, gangs, and prostitution activity. This Extended Stay America branded hotel was known to be used often by prostitutes due to its close proximity to the Bob Hope Airport.[46]

b. In April 2012, a 32-year old Los Angeles man was arrested on suspicion of trying to force a 16-year-old girl into prostitution out of an Extended Stay America branded hotel room in Santa Rosa.[47]

c. In June 2012, three prostitutes were arrested at an Extended Stay America branded hotel and both women had condoms and lubricant in their possession.[48]

d. In October 2014, a man was arrested at an Extended Stay America branded hotel located in Morrisville, North Carolina and faced three counts of human trafficking and several other charges for bringing three women to a hotel to work as prostitutes.[49]

e. In July 2015, the body of a prostitute was found in an Extended Stay America branded hotel in Burlington, Massachusetts allegedly by two men who were making a night of robbing prostitutes that they had found on Backpage.com ads.[50]

f. In January and February 2019, a former prostitute stated in her interview that she solicited her customers online and chose an Extended Stay America branded hotel

[46] *Prostitution arrests signal trend*, LA TIMES (Aug. 18, 2010), https://www.latimes.com/socal/burbank-leader/news/tn-blr-prostitutes-20100818-story.html.
[47] *Santa Rosa: Man Arrested in Child Prostitution Case*, THE PRESS DEMOCRAT (April 5, 2012), https://www.pressdemocrat.com/news/2612544-181/santa-rosa-man-arrested-in?sba=AAS.
[48] *See Three Prostitutes Arrested at Local Hotel,* PATCH WOBURN, MA (Jun. 13, 2012), https://patch.com/massachusetts/woburn/three-prostitutes-arrested-at-local-hotels.
[49] *Morrisville police charge man brought women to hotel as prostitutes*, THE NEWS & OBSERVER (Oct. 3, 2014), https://www.newsobserver.com/news/local/crime/article10082090.html.
[50] *Internet has driven sex industry deep into shadows*, BOSTON GLOBE (July 15, 2015), https://www.bostonglobe.com/metro/2015/07/15/for-prostitutes-terrible-life-made-worse/7tvir4sJNvIyMKQB7PGYoO/story.html.

First Amended Complaint for Damages - 29

specifically because it was "safer."[51]

g. In January and May 2019, several men were arrested for prostitution at an Extended Stay America branded hotel in Norton, Massachusetts.[52]

h. Additionally, Defendant ESA has been aware of sex trafficking on Extended Stay America branded properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Extended Stay America branded properties and Defendant ESA's inattentiveness, for example:

    i. In March of 2013, a reviewer titled a review of an Extended Stay America branded hotel in Portland, Oregon, as "Prostitute in next room," and further explained: "There was loud partying in the room next to us until midnight. Then a series of men had loud sex with a woman. The door would slam, then there would be some laughing and talking between a man and a woman. Then the bed would bang, the men would groan, then some quiet talking. The door would slam and the shower would run. This sequence of events repeated over and over again until 5:00 a.m."[53]

84. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant ESA has repeatedly failed to stop these actions.

[51] *Parents, kids concerned about prostitutes in neighborhoods*, NEWS4JAX (Feb. 27, 2019), https://www.news4jax.com/news/investigations/parents-kids-concerned-about-prostitutes-in-neighborhoods.
[52] *See Five arrested in prostitution sting in Norton*, THE SUN CHRONICLE (May 11, 2019), https://www.thesunchronicle.com/news/local_news/five-arrested-in-prostitution-sting-in-norton/article_8790422d-b205-5e4e-9068-8a31647b0671.html; *Three men arrested in prostitution sting at Norton hotel*, The Sun Chronicle (Jan. 13, 2019), https://www.thesunchronicle.com/news/local_news/three-men-arrested-in-prostitution-sting-at-norton-hotel/article_a79df30c-a487-5d06-a8e6-fe2b1e27276b.html.
[53] Review of Extended Stay America – Portland – Beaverton – Eider Court, Portland, OR (Mar. 13, 2013), *available at* https://www.tripadvisor.com/ShowUserReviews-g51765-d106928-r154442742-Extended_Stay_America_Portland_Beaverton_Eider_Court-Beaverton_Oregon.html.

First Amended Complaint for Damages - 30

85. Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence.[54]

86. ESA failed to implement and enforce any of its own policy or policies and protect Plaintiff A.B. from being sex trafficked.

87. As an industry leader, ESA failed to articulate any policy, process, or procedure that would measure the extent of the trafficking problem at its branded locations. Moreover, ESA did not articulate a policy, process, or procedure that could measure whether the "employee training" had the effect of reducing instances or expected instances of human trafficking.

88. Given Defendant ESA's public statements on behalf of its hotel brand and the control it assumed in educating, implementing, and directing its branded hotels, including Extended Stay America branded hotels, and the Extended Stay hotel where A.B. was trafficked for sex, Defendant ESA breached its duties in the following ways:

    a. failure to adequately distribute information to assist employees in identifying human trafficking;

    b. failure to provide a process for escalating human trafficking concerns within the organization;

    c. failure to mandate managers, employees, or owners to attend training related to human trafficking;

    d. failure to provide new hire orientation on human rights and corporate responsibility;

    e. failure to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    f. failure to develop and hold or require ongoing training sessions on human trafficking;

    g. failure to provide and mandate checklists, escalation protocols and information to

---

[54] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (E.D. Tenn. May 29, 2007).

First Amended Complaint for Damages - 31

property management staff or track performance indicators and key metrics on human trafficking prevention;

h. failure to evaluate universal reservation systems for suspicious booking activities;

i. failure to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

j. failure to ban cash or prepaid credit cards as payment; and

k. failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

89. Defendant ESA declined to implement policies that would likely have the effect of reducing the billions of dollars in sex trafficking profits. As a whole, Defendant ESA did not call for stricter room rental requirements. For example, Defendant ESA did not require ID or names of every person staying in the room; did not limit the number of people allowed to stay in a room; did not require a credit or debit card to be placed on file with a name on it (accepting prepaid credit cards and even cash); and did not monitor reservation patterns maintained and owned by their brand central reservation systems, data of which could only be analyzed by the brand Defendant with backend access. In short, Defendant refused to communicate to traffickers "your business and your money are not welcome here."

90. Through this effort, Defendant ESA was able to rest assured it would not have to implement effective policies and procedures. Given that human trafficking does more than $100 billion in business a year and the fact that a large percent of all trafficking ventures occur at hotels and motels—there can be no doubt that Hotel Brands, as an industry, generate billions of dollars every year from the facilitation of human trafficking.

First Amended Complaint for Damages - 32

## C. THE SEX TRAFFICKING OF A.B. AT THE EXTENDED STAY AMERICA PORTLAND – VANCOUVER

91. A.B. was trafficked at the Extended Stay America – Portland-Vancouver ("Extended Stay hotel") beginning in approximately September 2012 through March 2013. A.B. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, and false imprisonment at the Extended Stay hotel from approximately September 2012 to March 2013.

92. A.B. was forced to have sex for payment with various buyers at the Extended Stay hotel in response to advertisements for commercial sex that her trafficker posted on www.backpage.com.[55]

93. A.B. was sold by her trafficker for sex to at least seven (7) "clients" or "buyers" per night.

94. During times she was with a "client," her trafficker used hotel Wi-Fi to post advertisements, talk to "clients," and watch and record her sexual acts.

95. The trafficker would secretly record her having sex with the sex buyers, to use as blackmail against her.

96. Upon information and belief, recordings of this nature would have signaled large amounts of data usage identifiable by the hotel directly by slowing and delays caused by the drag on connectivity throughout the hotel.

97. Upon information and belief, the location of the computers involved in these recordings could be identified given the modems and access locations, which would be available and identifiable to the hotel and any third-party established to maintain and monitor Wi-Fi access.

98. From approximately September 2012 through March 2013, the Plaintiff was

[55] *Id.*

First Amended Complaint for Damages - 33

Restore the Child, PLLC
2522 N Proctor St, Ste 85
Tacoma, Washington 98406
Phone: (253) 392-4409

repeatedly trafficked for sex at the Extended Stay hotel.

99. Each buyer entering the Extended Stay property was a non-paying guest and left shortly after he arrived. Her trafficker would wait in the lobby while A.B. was sex trafficked on the Extended Stay property. The foot traffic to the rooms was constant and voluminous.

100. A.B. would often be dressed inappropriately for the weather, wearing a tank top shirt and short shorts, as she walked through the lobby.

101. The trafficker would check into the Extended Stay hotel by himself, using his own debit card or cash. He would request one room with two beds and two room keys. After checking in, he would bring one of the room keys to A.B., who was told to wait in the car. A.B. would then walk by herself through the lobby as an unregistered guest and into the room without making eye contact.

102. During the day, each buyer would enter through the lobby as unregistered guests.

103. Abundant used condoms were scattered across various surfaces and visible to any hotel employee who entered the room.

104. A.B. was trafficked at the Extended Stay hotel for one to three nights a week and would stay biweekly for several months.

105. The trafficker would come to the hotel room to collect the money from A.B. after each "date."

106. A.B. was required to avoid eye contact with hotel staff and did not speak to anyone. Despite numerous surveillance cameras throughout the hotel properties, no help or attention was given to A.B. by any hotel staff.

107. The Plaintiff encountered the same hotel staff over the course of the time she was trafficked for sex at the Extended Stay hotel. Hotel staff ignored A.B. and did nothing to prevent the ongoing torture she endured while she was regularly trafficked for sex at the Extended Stay property.

First Amended Complaint for Damages - 34

108.  Despite obvious signs of human trafficking (no eye contact, inappropriate attire, suspicious check-in behavior, and duration of stay) and indicators of commercial sex activity (bottles of lubricants, boxes of condoms, used condoms in the trash, excessive requests for towels and linens, and room rentals by her trafficker with cash or debit card while A.B. actually entered the room), Defendants failed to recognize or report Plaintiff A.B.'s trafficking.

109.  Through constant room rentals to her trafficker, the Defendants harbored or otherwise facilitated the sex trafficking of A.B. on their hotel property and accordingly, financially benefited from the Plaintiff's sexual exploitation, abuse, and trafficking. Furthermore, the Defendants failed to prevent her continued victimization.

110.  Prior to, during, and following the incidents described herein, the Defendants had actual and/or constructive knowledge of drug dealing, prostitution, and/or general safety concerns at their hotels, through means including, but not limited to, video surveillance of their hotels, online customer reviews, and oral or written complaints regarding said suspicious activity. The Defendants failed to take any action to curtail these activities.

111.  Had the Defendants or any of its staff, managers, or employees been trained to recognize well-known signs of human trafficking being conducted at their hotel and on their property, and the apparent red flags outlined above, it would have been impossible for the Defendants not to notice the victimization of A.B.

112.  Hotel staff were inadequately trained and unprepared to address the ongoing torture the Plaintiff endured while she was regularly trafficked for sex at the Extended Stay hotel.

113.  The impact of being sex trafficked at the Extended Stay property has forever emotionally and physically injured A.B. who, despite the many years since her escape, suffers immensely as a result of the horrors inflicted upon her at the Extended Stay hotel.

**D.    THE DEFENDANTS FACILITATED THE TRAFFICKING OF A.B.**

202.  Defendants profited from the sex trafficking of A.B and knowingly or negligently

First Amended Complaint for Damages - 35

aided, enabled, and facilitated the sex trafficking of A.B. The Defendants leased rooms to A.B.'s trafficker when they knew, or should have known, that her trafficker was using their room to subject A.B. to repeated exploitation as he forced her into sexual servitude.

203. Defendants knew, or should have known, that A.B. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because A.B.'s trafficker frequented the Defendants' hotel.

204. Defendants benefited from the steady stream of income that A.B.'s trafficker and "johns" would bring to their branded property. Defendants profited from each and every room that A.B.'s traffickers and "clients" rented.

205. Defendants knew, or should have known, that A.B. was being trafficked because A.B. constantly entertained traffic to appease her traffickers' daily quotas, and her traffickers would help check her in then not proceed to the room; behavior that indicated he was using the Defendants' hotel to harbor, exploit, abuse, and traffic the Plaintiff.

206. Defendants were aware that trafficking is a common problem within the hospitality industry.

207. Defendants knew or should have known of human trafficking occurring at the location where A.B. was trafficked because of Defendants' access to information, such as police reports, news articles, complaints, and negative customer reviews regarding the specific location and surrounding areas.

208. Defendants repeatedly collected data on A.B., her traffickers, and "buyers" from the many stays at Defendants' hotel, including but not limited to room reservations, identification, payment information, data from websites visited while using Defendants' Wi-Fi, and other guest data. Defendants' employees witnessed the obvious signs of sex trafficking such as signs of eye contact and avoidance from A.B., frequent foot traffic in and out of her room, large numbers of

First Amended Complaint for Damages - 36

condoms in the trash and other areas in the room, frequent requests for linen changes and towels, multiple phones and computer equipment being used, hotel Wi-Fi use for ads. Despite access to copious amounts of information, Defendants failed to take reasonable measures to stop sex trafficking from occurring in their hotel.

209. Defendants all had the opportunity to stop A.B.'s trafficker and offenders like him from victimizing A.B. and others like her. Instead, every Defendant failed to take reasonable measures to prevent sex trafficking from occurring in their hotel.

210. Defendants all financially benefited from the sex trafficking of A.B., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

211. Defendants enjoy the steady stream of income that sex traffickers bring to their hotels.

212. Defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

213. Defendants have long been aware that free Wi-Fi is attractive to traffickers, yet failed to provide adequate security to protect Plaintiff, including adequate measures to monitor Wi-Fi access. The myriad types of electronically stored information ("ESI") generated in the use of a Wi-Fi network can manage and track communications and activity originating from devices granted access. By way of the ESI generated through the use of Defendants' Wi-Fi networks, Defendants had information in their custody, control, and possession that enabled them to identify the purpose for which their Wi-Fi network and their property were being used and by which they profited.

214. Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties.

First Amended Complaint for Damages - 37

215. Defendants maintained their deficiencies to maximize profits by:

    a. Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

    b. Lowering operating costs and management costs by not analyzing the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the issues at relevant locations or else hold the franchisee accountable and terminate their franchise agreement;

    c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

    d. Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

    e. Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation;

216. As a direct and proximate result of these egregious practices on the part of the Defendants, A.B. and other victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**<u>CAUSES OF ACTION</u>**

**A. COUNT ONE – 18 U.S.C § 1595 ("TVPRA")**

**(Against all Defendants)**

217. The Plaintiff A.B. incorporates each foregoing allegation.

First Amended Complaint for Damages - 38

Restore the Child, PLLC
2522 N Proctor St, Ste 85
Tacoma, Washington 98406
Phone: (253) 392-4409

218. A.B. is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

219. The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. § 1591 (a). At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of A.B. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

220. The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefited from the trafficking of A.B. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotel. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of A.B.'s injuries and damages.

221. A.B. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotel in violation of 18 U.S.C. § 1591(a).

## **PRAYER FOR RELIEF**

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

    a.  All available compensatory damages for the described losses with respect to each cause of action;

First Amended Complaint for Damages - 39

Restore the Child, PLLC
2522 N Proctor St, Ste 85
Tacoma, Washington 98406
Phone: (253) 392-4409

b.  past and future medical expenses, as well as the costs associated with past and future life care;

c.  past and future emotional distress;

d.  consequential and/or special damages;

e.  all available noneconomic damages, including without limitation, pain, suffering, and loss of enjoyment of life;

f.  disgorgement of profits obtained through unjust enrichment;

g.  restitution;

h.  punitive damages with respect to each cause of action;

i.  reasonable and recoverable attorneys' fees;

j.  costs of this action; and

k.  pre-judgment and all other interest recoverable.

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

First Amended Complaint for Damages - 40

Restore the Child, PLLC
2522 N Proctor St, Ste 85
Tacoma, Washington 98406
Phone: (253) 392-4409

Dated: March 15, 2023                    RESPECTFULLY SUBMITTED,


                                  /s/ Susanna L. Southworth
                                  Susanna L. Southworth, PhD, JD
                                  WA Bar No. 35687
                                  RESTORE THE CHILD, PLLC
                                  2522 N Proctor St, Ste 85
                                  Tacoma, WA 98406
                                  T: (253) 392-4409
                                  E: susanna@restorethechild.com

                                  /s/ Kathryn L. Avila
                                  Kathryn L. Avila
                                  *pro hac vice*
                                  FL Bar No. 1019574
                                  LEVIN, PAPANTONIO, RAFFERTY,
                                  PROCTOR, BUCHANAN, O'BRIEN,
                                  BARR & MOUGEY, P.A.
                                  316 S. Baylen St. Suite 600
                                  Pensacola, FL 32502
                                  T: 850.436.6246
                                  F: 850.436.6271
                                  E: kavila@levinlaw.com

                                  **Attorneys for Plaintiff**

First Amended Complaint for Damages - 41                    Restore the Child, PLLC
                                                            2522 N Proctor St, Ste 85
                                                            Tacoma, Washington 98406
                                                            Phone: (253) 392-4409